# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| **ISABEL C. SOLIS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-14-CV-00094-DCG** |
| | § | |
| **AT&T,** | § | |
| | § | |
| **Defendant.** | § | |

## ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Presently before the Court is Defendant AT&T's ("Defendant") "Motion for Summary Judgment" ("Motion") (ECF No. 26), filed on January 26, 2015. Plaintiff Isabel C. Solis, formerly known as Isabel Cobas ("Plaintiff"), filed a Response (ECF No. 44), with the Court's leave, on June 16, 2015, and Defendant filed a Reply (ECF No. 47) on June 30, 2015. Plaintiff, who was formerly employed as a Service Representative by Defendant, brings this action pursuant to the Americans with Disabilities Act ("ADA" or "the Act"), 42 U.S.C. § 12101 *et seq.*, as amended by the Americans with Disabilities Act Amendments Act. *See* Notice of Removal, Ex. 1 at 5–8 ("Original Petition").[1] Plaintiff alleges that Defendant discriminated against her because of a disability by failing to provide a reasonable accommodation in violation of the ADA. *See* Original Pet. 6–7. Defendant avers that Plaintiff was terminated for unsatisfactory attendance in violation of the conditions of her employment and that her dismissal was lawful. *See* Mot. 1. After careful consideration of the Motion, the Response, the Reply, and the applicable law, the Court enters the following order.

---

[1] The Court cites to the ECF pagination for all exhibits referenced throughout the Order.

## I.  LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine dispute of fact exists when evidence is sufficient for a reasonable jury to return a verdict for the non–moving party, and a fact is material if it might affect the outcome of the suit." *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (citation and quotation marks omitted).  A "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If the moving party meets this initial burden, "the onus shifts to 'the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).  The Court must draw all reasonable inferences in favor of the nonmoving party. *Id.* (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)).  In doing so, the Court considers only competent summary judgment evidence. *See* Fed. R. Civ. P. 56(c); *Goodwin v. Johnson*, 132 F.3d 162, 186 (5th Cir. 1997); *Tucker v. SAS Inst., Inc.*, 462 F. Supp. 2d 715, 722 (N.D. Tex. 2006).

## II.  UNDISPUTED FACTS

### A.  *Defendant's Attendance Policy*

Defendant's official attendance policy is documented in the company's "Operating Practice No. 45." *See* Mot., Ex. 2 ¶ 4; *id.*, Ex. 9 ¶ 2; *id.*, Ex. 10 ("Operating Practice Manual" or

"the Manual"). The Manual makes a condition of employment "the responsibility of being on the job as scheduled. . . . The [c]company [p]olicy on absence is that good attendance and punctuality are required." Operating Practice Manual 1. "Good attendance" is defined as "a demonstrated ability to be on the job on time over sustained periods of time." *Id.*

The Operating Practice Manual further provides that "[t]he determination of whether a particular employee's attendance is satisfactory or not is made on an individual basis, taking into account all the relevant factors pertaining to each employee's attendance record." *See id.* According to the Manual, some of the factors taken into account in evaluating each case are: (1) the number and frequency of absence and tardiness; (2) the reason for the absence and tardiness; (3) the employee's past history of absence and tardiness; (4) the amount of time lost; (4) the employee's attitude toward maintaining satisfactory attendance; and (5) the prognosis of the employee's attendance for the future. *See id.* at 1–2. While employed by Defendant, Plaintiff signed a form that summarized Defendant's attendance policy, as described in the Operating Practice Manual, on at least three separate occasions: March 12, 2009; February 12, 2008; and March 13, 2007. *See* Def.'s Proposed Undisputed Facts ("PUF") ¶ 8; Pl.'s Resp. to Def.'s Proposed Undisputed Facts ("RPUF") ¶ 8; Mot., Ex. 11.

**B. *Defendant's Disciplinary Policy***

Defendant's official disciplinary policy is documented in the company's "Positive Discipline Policy and Procedure." *See* Mot., Ex. 2 ¶ 4; *id.*, Ex. 9 ¶ 3; *id.*, Ex. 13 ("Disciplinary Policy"). The Disciplinary Policy covers three areas of employee performance, including attendance, and provides for a disciplinary system with three progressive levels of intervention to ensure "good performance." *See* Disciplinary Policy 3–4. The three graded levels of discipline

in the Disciplinary Policy are: Performance Notice (Level One); Written Reminder (Level Two); and Decision Making Leave or DML (Level Three). *See id.* at 4–10.

## 1. Level One: Performance Notice

"In most discipline cases the [Disciplinary Policy] system will be implemented beginning with [L]evel [O]ne," the Performance Notice. *Id.* at 5. The Performance Notice consists of a meeting between the employee and his or her supervisor in which they "discuss the job performance problem. . . . The employee is informed that improvement is expected in the deficient area of performance, as well as an indication of consequences if no improvement is forthcoming." *Id.* This meeting is to be documented in the employee's personnel file. *See id.* "A Performance Notice . . . remain[s] active for six months." *Id.* at 6.

## 2. Level Two: Written Reminder

Level Two, the Written Reminder, "documents a formal conversation between the supervisor and an employee about a very serious performance problem. The conversation is followed by the supervisor's Written Reminder to the employee summarizing the conversation." *Id.* Level Two is triggered by one of three conditions:

    a. an employee's performance has not met the job requirements within the six–month period for a Performance Notice;

    b. an employee already has three active Performance Notices in separate categories and a performance problem requiring discipline arises; or

    c. a single incident occurs which is serious enough to warrant the Written Reminder level regardless of any previous discipline.

*Id.* The Written Reminder is to be placed in the employee's personnel file, and remains active for nine months. *See id.* at 7–8.

### 3. Level Three: Decision Making Leave or DML

Level Three, the Decision Making Leave or DML, is the final level of discipline in Defendant's Disciplinary Policy. *See id.* at 8. It "begins with a formal discussion between the supervisor and the employee about an extremely serious performance problem that can result in dismissal." *Id.* During this "pre–DML discussion," the supervisor must ask the employee whether there is anything the supervisor can do or provide to accommodate or assist in improving the employee's performance. *See id.* "If reasonable accommodations are validated and can be made, the supervisor will work with the appropriate contacts as directed by [a] Job Accommodation Consultant." *Id.* The aforementioned question and the employee's response "should be included in [the] documentation of the [pre–DML] discussion. At the conclusion of this discussion, the employee will be placed on [leave] for the following scheduled work day with pay." *Id.* While an employee is on Level Three, he or she is "subject to dismissal if all the requirements [of good performance] are not met." *Id.* at 9. Level Three is active for twelve months, *id.* at 10, and is triggered by one of three conditions:

    a.  an employee has not achieved and maintained job performance requirements during the nine–month active time period for a Written Reminder;

    b.  an employee already has two active Written Reminders in separate categories and a performance problem requiring discipline arises; or

    c.  an employee commits an extremely serious offense (whether or not previous discipline has taken place).

*Id.* at 9.

### C. *Defendant's Integrated Disability Service Center*

When one of Defendant's employees is injured and is unable to work, he or she is required to contact Defendant's Integrated Disability Service Center ("IDSC"). PUF ¶ 38; RPUF ¶ 38. When an employee reports an illness or injury, IDSC establishes a claim file and assigns a

Case Manager ("CM") to the case. *See* PUF ¶ 40; RPUF ¶ 40. The CM contacts the employee

to obtain information about his or her injury, including the name(s) of his or her health care

provider(s). PUF ¶ 41; RPUF ¶ 41. The CM then obtains medical records from the employee's

health care provider(s) to determine if the employee's condition is such that he or she cannot

work and is eligible for payment of disability benefits. *See* PUF ¶ 42; RPUF ¶ 42. The CM also

notifies the employee's supervisor that a disability claim has been made. *See* PUF ¶ 43; RPUF

¶ 43. If IDSC determines that the employee is eligible for benefits, the supervisor and the

employee are notified of the decision. *See* PUF ¶¶ 45–47; RPUF ¶¶ 45–47. This notice specifies

the dates the employee is eligible to receive disability benefits. PUF ¶ 48; RPUF ¶ 48.

In addition to administering benefits, IDSC also obtains information from the employee's

health care provider(s) to determine if and when the employee may return to work, whether the

employee will have any medical restrictions that prevent him or her from performing his or her

job, and whether the employee requires any accommodations. PUF ¶ 49; RPUF ¶ 49. If an

accommodation is required, the health care provider(s) informs IDSC what specific

accommodation is needed. PUF ¶ 50; RPUF ¶ 50. The CM then contacts the employee's

supervisor or department manager to determine if the requested accommodation can be provided.

PUF ¶ 51; RPUF ¶ 51. If an accommodation can be provided, the CM coordinates the

employee's return to work date with the supervisor or the department manager. PUF ¶ 52; RPUF

¶ 52.

### D.  *Plaintiff's First Period of Absences*

On June 24, 2010, Plaintiff suffered a physical injury that limited her ability to attend

work. *See* PUF ¶¶ 53–57; RPUF ¶¶ 53–57. On July 2, 2010, Plaintiff contacted IDSC and

reported her injury, which initiated a claim for disability benefits. *See* PUF ¶ 53; RPUF ¶ 53.

Based on information received from two health care providers—Dr. Stephen Untersee (a chiropractor) and Dr. Raul Jimenez—IDSC approved Plaintiff's disability claim for the periods of July 1 to July 7, and July 9 to August 8, 2010. *See* PUF ¶¶ 57–62; RPUF ¶¶ 57–62. On August 6, 2010, IDSC received information from one of Plaintiff's health care providers— Alternatives Centre for Behavioral Health ("Alternatives")—advising it that Plaintiff was still unable to return to work. *See* PUF ¶ 63; RPUF ¶ 63. Accordingly, IDSC extended Plaintiff's disability claim through August 22, 2010. *See* PUF ¶ 64; RPUF ¶ 64.

On August 23, 2010, Plaintiff informed IDSC that she would return to work with a vacation day the following day, August 24. *See* Mot., Ex. 19 at 21. On August 30, 2010, IDSC was advised that Plaintiff would be absent from work that day. PUF ¶ 70; RPUF ¶ 70. On September 8, 2010, Plaintiff contacted IDSC and informed the CM that she was again being treated by Alternatives. *See* PUF ¶ 76; RPUF ¶ 76. On September 9, 2010, Alternatives contacted IDSC with information that Plaintiff was not able to work until October 1, 2010. PUF ¶ 77; RPUF ¶ 77. On September 9, 2010, IDSC sent a letter to Plaintiff informing her that it had approved her disability claim for the period between August 30 and September 30, 2010. PUF ¶ 78; RPUF ¶ 78. On September 29, 2010, IDSC approved an extension of Plaintiff's disability benefits through October 14, 2010, based on information it received from Plaintiff's health care providers. *See* PUF ¶¶ 80–83; RPUF ¶¶ 80–83. On October 15, 2010, Plaintiff contacted IDSC to advise it that she had returned to work that day. PUF ¶ 86; RPUF ¶ 86.

On October 15, 2010, Patricia Ragsdale, one of Defendant's Attendance Managers, informed Plaintiff that she had exhausted her allotted leave under the Family and Medical Leave Act ("FMLA") and that her attendance was unsatisfactory. *See* PUF ¶¶ 88–89; RPUF ¶¶ 88–89. Ragsdale also gave Plaintiff a Written Reminder, the second level of Defendant's Disciplinary

Policy. *See* PUF ¶ 90; RPUF ¶ 90.  On October 20, 2010, Ragdale contacted IDSC to report that

Plaintiff was unable to report to work that day.  PUF ¶ 93; RPUF ¶ 93.  On October 21, 2010,

IDSC contacted Plaintiff acknowledging her new disability claim and enclosing forms for her

health care providers to complete.  PUF ¶ 94; RPUF ¶ 94.  On October 29, 2010, IDSC approved

Plaintiff's latest disability claim for the period between October 20 and November 8, 2010, based

on medical information provided by Plaintiff's health care providers.  PUF ¶¶ 97–98; RPUF

¶¶ 97–98.  IDSC then extended Plaintiff's disability claim through November 15.  PUF ¶ 105;

RPUF ¶ 105.  Ultimately, during this first period of absences, Plaintiff was absent from June 24

to July 7; July 9 to August 22; August 30 to October 14; and October 20 to November 15, of

2010.  *See* PUF ¶¶ 87, 105; RPUF ¶¶ 87, 105; Mot., Ex. 2 ¶ 5.

### E.   *Request for Accommodation*

Soon after Plaintiff was injured, on July 23, 2010, IDSC received a fax from Dr. Untersee

stating that Plaintiff needed an ergonomic (sit/stand) workstation to avoid aggravating her

medical condition.  *See* Mot., Ex. 20 at 10.  On August 3, Ragsdale advised IDSC that Plaintiff's

department could accommodate that request.  PUF ¶ 100; RPUF ¶ 100.  On September 30, 2010,

IDSC informed Plaintiff that Defendant had ordered an ergonomic workstation for her use and

that it was expected to be available in November.  *See* PUF ¶ 101; RPUF ¶ 101.  On November

2, 2010, Ragsdale informed IDSC that the ergonomic workstation was ordered on August 26,

2010, and was expected to be delivered on November 9.  PUF ¶ 102; RPUF ¶ 102.  On

November 8, 2010, Plaintiff advised IDSC that her department had told her the ergonomic

workstation would not be ready by November 9 and she would not be able to return to work.

PUF ¶ 103; RPUF ¶ 103.  On November 15, 2010, Ragsdale informed IDSC that the ergonomic

workstation had been received and installed, which the CM relayed to Plaintiff on the same day.

*See* PUF ¶ 104; RPUF ¶ 104.  IDSC therefore extended Plaintiff's disability claim from October

20 through November 15, 2010.  *See* PUF ¶ 105; RPUF ¶ 105.

### F.  *Plaintiff's Second Period of Absences*

Plaintiff returned to work on November 16, 2010.  *See* PUF ¶¶ 106–07;[2] RPUF ¶ 107.

Upon her return, Ragsdale informed Plaintiff that her absences were not protected because she

had exhausted her FMLA leave, and placed her on DML, Defendant's third disciplinary level.

PUF ¶ 107; RPUF ¶ 107.  On December 21, 2010, IDSC was notified that Plaintiff had been

absent from work since December 14, 2010.  PUF ¶ 109; RPUF ¶ 109.  On December 21, 2010,

Plaintiff informed IDSC that her ergonomic workstation was under an air conditioning vent, that

this aggravated her back condition, and that the desk could not be moved.  PUF ¶ 110; RPUF

¶ 110.  After receiving new medical records from Plaintiff's health care providers, IDSC

approved a new disability claim for the period between December 21, 2010, and January 2, 2011,

which IDSC later extended through January 18.  *See* PUF ¶¶ 111–12; RPUF ¶¶ 111–12.

On January 18, 2010, Dr. Untersee informed IDSC that Plaintiff could return to work full

time on restricted duty.  PUF ¶ 113; RPUF ¶ 113.  On that same day, IDSC advised Plaintiff she

would be released to work with certain restrictions beginning on January 19.  PUF ¶ 114; RPUF

¶ 114.  On January 19, 2010, Pimi Reveles, one of Defendant's Attendance Managers, informed

IDSC that Plaintiff's department could accommodate Dr. Untersee's prescribed restrictions.  *See*

PUF ¶ 115; RPUF ¶ 115.  Also on January 19, 2011, Plaintiff advised IDSC that she was seeking

psychiatric care and could not return to work.  PUF ¶ 116; RPUF ¶ 116.  Based on information

IDSC received from Alternatives, IDSC extended Plaintiff's disability benefits repeatedly, the

last extension of which ended on April 3, 2011.  *See* PUF ¶ 118; RPUF ¶ 118.  Plaintiff was

---

[2] Defendant's Proposed Undisputed Facts contains two paragraphs numbered 106.  *See* PUF 14.
The Court cites to the second of these paragraphs.

released to return to work on a half–day schedule beginning April 4, 2011. *See* PUF ¶ 119;

RPUF ¶ 119. During this second period of absences, Plaintiff was absent from December 14,

2010, to April 3, 2011. *See* PUF ¶ 120; RPUF ¶ 120.

**G.  *Plaintiff's Termination***

By April 4, 2011, Plaintiff had exhausted her allowable FMLA leave and her absences

were unprotected for the purpose of tracking her attendance. *See* PUF ¶ 121; RPUF ¶ 121.

Plaintiff received wage replacement benefits under Defendant's Disability Income Plan while

she was absent from work. PUF ¶ 122; RPUF ¶ 122. On April 4, 2011, Reveles suspended

Plaintiff and recommended that she be dismissed for unsatisfactory attendance in violation of her

DML. *See* PUF ¶¶ 123–25; RPUF ¶¶ 123–25. Reveles could not suspend Plaintiff while she

was under Defendant's Disability Income Plan due to an agreement with Defendant's

employees' union. *See* PUF ¶¶ 127–28; RPUF ¶¶ 127–28. On April 26, 2011, Plaintiff had a

meeting with Devin Lawson, the Defendant's Sales Manager for the location where Plaintiff was

employed, Carmen Mata, a union representative, and Julene Baldwin, Defendant's General

Manager for the office in question. *See* PUF ¶¶ 129–30; RPUF ¶¶ 129–30. On April 27, 2011,

Baldwin accepted Reveles' recommendation and discharged Plaintiff. PUF ¶ 131; RPUF ¶ 131.

### III.  DISCUSSION

"The American with Disabilities Act is an antidiscrimination statute designed to remove

barriers which prevent qualified individuals with disabilities from enjoying employment

opportunities available to persons without disabilities." *Seaman v. CSPH, Inc.*, 179 F.3d 297,

300 (5th Cir. 1999) (citing *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155 (5th Cir. 1996)). To

prevail on her ADA claim, Plaintiff must establish that: (1) she has a disability; 2) she is

qualified for the position from which she was terminated; and (3) she was discriminated against

because of her disability. *See Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 222 (5th Cir. 2011) (citing *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007)). "Under the ADA, to 'discriminate' includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'" *Id.* (quoting 42 U.S.C. § 12112(b)(5)(A)).

For purposes of the Motion, Defendant does not dispute that Plaintiff has a disability. *See* Mot. 15. Defendant argues, however, that Plaintiff cannot establish she was qualified for the position from which she was terminated. *See id.* at 15–17. Specifically, Defendant argues that (1) regular attendance is an essential function of the Service Representative position from which Plaintiff was terminated, and (2) Plaintiff did not perform this essential function. *See id.* at 16–17. In response, Plaintiff appears to argue that (1) Defendant has not demonstrated that attendance is an essential function of a Service Representative, *see* Resp. 16; and (2) even if attendance were an essential function of this position, Defendant failed to provide a reasonable accommodation that would permit Plaintiff to perform this function, *see id.* at 19.[3] Thus, according to Plaintiff, the ADA required Defendant to modify its attendance policy and grant her leave beyond that provided by the FMLA in light of Plaintiff's disability. *See id.* at 1–2. Indeed, whether Plaintiff requested the reasonable accommodation that Defendant modify its attendance policy is the only disputed issue of material fact proposed by Plaintiff. *See* RPUF 20.[4]

---

[3] Plaintiff also appears to launch a broader challenge on Defendant's attendance policy on the grounds that an employer cannot implement disability–neutral policies under which disabled and non-disabled employees are treated the same. *See* Resp. 12. That argument fails because the undisputed facts show that Defendant's attendance and disciplinary policies require an individualized assessment of each employee's circumstances. *See supra* Section II.A–B.

[4] It is undisputed that Defendant provided the accommodation of an ergonomic workstation in November 2010. *See* PUF ¶ 104; RPUF ¶ 104.

Here, even if Plaintiff requested a modification of Defendant's attendance policy, which she has failed to show with competent summary judgment evidence, a request for the kind of extended and indeterminate leave Plaintiff sought is not a request for a "reasonable accommodation" under the ADA.

## A. *Regular Attendance Is an Essential Function of Defendant's Service Representative Position*

The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). As stated briefly above, Defendant maintains that regular attendance is an essential function of its Service Representative position. *See* Mot. 16–17. Plaintiff appears to believe otherwise. *See* Resp. 16. "[R]egular attendance is an essential function of most jobs," *Hypes on Behalf of Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) (citations omitted) (*per curiam*); *see also Colon–Fontanez v. Mun. San Juan*, 660 F.3d 17, 33 & n.15 (1st Cir. 2011) (finding that the majority of circuit courts, including the Fifth Circuit, have recognized that attendance is an essential function of most jobs), and contrary to Plaintiff's assertions, Defendant has made the requisite showing that regular attendance is an essential function of the position from which Plaintiff was terminated.

Defendant's Operating Practice Manual makes a condition of employment "the responsibility of being on the job as scheduled. . . . The [c]ompany [p]olicy on absence is that good attendance and punctuality are required." Operating Practice Manual 1. "Good attendance" is defined as "a demonstrated ability to be on the job on time over sustained periods of time." *See id.* The Operating Practice Manual further provides that "[t]he determination of whether a particular employee's attendance is satisfactory or not is made on an individual basis,

-12-

taking into account all the relevant factors pertaining to each employee's attendance record."
*See id.*

Defendant has also submitted uncontested declarations from two Attendance Managers
confirming that the attendance policy in its Operating Practice Manual is enforced as described
above. *See* Mot., Exs. 2, 9. It is undisputed that Plaintiff was aware of this requirement. *See*
PUF ¶ 8; RPUF ¶ 8; Mot., Ex. 11. Indeed, Attendance Manager Patricia Ragsdale explained to
Plaintiff on October 15, 2010, why Defendant considers regular attendance an essential function
of the Service Representative position from which she was terminated: "[a]bsence impacts the
ability to provide an excellent customer experience by causing busy condition[s] leading to
missed customer calls or delays in answering calls[;] [a]bsence impacts revenue results, the
quality of customer service and increases the work load and overtime for other employees." *See*
Mot., Ex. 4; *id.*, Ex. 2 ¶ 5. "[A]s long as [these] specifications are 'job–related, uniformly–
enforced, and consistent with business necessity, the employer has the right to establish what a
job is and what is required to perform it.'" *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877,
896 (10th Cir. 2015) (quoting *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 993 (10th Cir. 2001)).
Accordingly, the Court finds that attendance is an essential function of the position from which
Plaintiff was terminated.

### B. *Plaintiff Fails to Create Genuine Issue of Material Facts*

Defendant has shown that there is no genuine issue of material fact that attendance is an
essential function of the Service Representative position from which Plaintiff was terminated and
that Defendant provided Plaintiff with an ergonomic workstation to accommodate her back
injury. Therefore, for Plaintiff to prevail on her failure–to–accommodate claim, she must go
beyond the Original Petition and present competent evidence designating "specific facts" that

show a genuine issue for trial regarding her other alleged request for accommodation: a modification of Defendant's attendance policy. *See* Fed. R. Civ. P. 56(c); *LHC Group, Inc.*, 773 F.3d at 694 (quoting *Celotex Corp.*, 477 U.S. at 324). Plaintiff has not met this burden.

Defendant maintains that "Dr. Untersee's request that [Plaintiff] be provided with the sit/stand desk was the only job accommodation that [Plaintiff] and her health care providers requested." PUF ¶ 106.[5] As required by Federal Rule of Civil Procedure 56(c), Defendant supports this factual position with a declaration from Susan Hagestad, the Manager of Total Performance for IDSC's third party administrator. *See id.*; Mot., Ex. 17 ¶¶ 1–2, 12. Plaintiff denies this factual position by citing to unauthenticated documents and hearsay statements without asserting an exception to the hearsay rule. *See* RPUF ¶ 106; *see also* RPUF 20 (attempting to create a genuine issue of material fact without supporting factual assertions as required by Rule 56(c)). Defendant objects to Plaintiff's proffered evidence on these grounds. *See* Reply 3.

It is the nonmovant's burden, when disputing a factual position in a motion for summary judgment, to put forth competent summary judgment evidence showing that there is a genuine issue for trial. "While the form of the nonmovant's evidence need not be admissible, the content of the evidence must meet evidentiary requirements." *Tucker*, 462 F. Supp. 2d at 722 (citing *Goodwin*, 132 F.3d at 186); *accord Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995) ("Evidence on summary judgment may be considered to the extent not based on hearsay or other information excludable at trial."). These evidentiary requirements include authentication of proffered documents, *see* Fed. R. Evid. 901, and exclusion of hearsay statements, *see* Fed. R. Evid. 802.

---

[5] Defendant's Proposed Undisputed Facts contains two paragraphs numbered 106. *See* PUF 14. The Court cites to the first of these paragraphs.

Based on the foregoing, the Court finds Defendant's objections justified. Thus, the instant Motion could be granted on this basis alone. But even if Plaintiff made the additional request that Defendant modify its attendance policy to accommodate Plaintiff's absences, her failure–to–accommodate claim still fails as a matter of law for the reasons that follow.

## C. *Defendant Is not Required to Accommodate a Request for Erratic and Indeterminate Leave*

Plaintiff argues that Defendant violated the ADA by failing to modify its attendance policy to accommodate Plaintiff's absences. *See* Resp. 19. Plaintiff specifically claims that Defendant "received [Plaintiff]'s verbal request for the reasonable accommodation of a modification of [Defendant]'s . . . attendance policy upon her return to work on October 15, 2010." *Id.* at 23. On that day, Plaintiff appears to have stated to Attendance Manager Patricia Ragsdale, in response to a question regarding the possibility of future absences, that she (Plaintiff) "need[ed] to keep [her] medical appointments" and that would be the reason for any additional absences. *See* Resp. 23. Even if Plaintiff had shown with competent summary judgment evidence that she requested a modification of Defendant's attendance policy on October 15, 2010, or that Plaintiff's health care providers communicated this request in another way, such a request was not for a *reasonable* accommodation.

To begin, "where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Griffin*, 661 F.3d at 224 (quoting *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009)). It is neither apparent nor obvious that an employee who has been diagnosed as having a lower back injury and mental health issues will require extended, erratic, and indeterminate leave going forward. Accordingly, it was Plaintiff's

burden to suggest, via her health care providers or otherwise, what reasonable accommodation she required. Plaintiff has not shown that she made this request with sufficient specificity.

Further, assuming Plaintiff met this initial burden when she stated that she needed to keep her medical appointments, Plaintiff's failure–to–accommodate claim still fails as a matter of law. On November 15, 2010, Defendant received and installed an ergonomic workstation, acceding to Plaintiff's earlier request for such equipment. *See* PUF ¶ 104; RPUF ¶ 104. Yet Plaintiff continued to display an erratic, extended, and indeterminate pattern of absences. On December 21, 2010, IDSC was informed that Plaintiff had been absent from work since December 14. PUF ¶ 109; RPUF ¶ 109. On that same day, Plaintiff informed IDSC that the location of her new workstation was under an air conditioning vent, which aggravated her back condition, and that the desk could not be moved. PUF ¶ 110; RPUF ¶ 110; *see also* Mot., Ex. 25 at 2–4. IDSC therefore approved a new disability claim for Plaintiff for the period between December 21, 2010, and January 2, 2011, based on information received from Plaintiff's chiropractor. *See* PUF ¶ 111; RPUF ¶ 111. Plaintiff's disability benefits were then extended through January 9, and again through January 18, 2011, based on information received from Plaintiff's health care providers related to her lower back problems. *See* PUF ¶ 112; RPUF ¶ 112. However, on January 18, 2011, Plaintiff's chiropractor advised IDSC that Plaintiff could return to work full time on restricted work duty if she was allowed to stretch for five minutes every hour while seated at her desk. PUF ¶ 113; RPUF ¶ 113. Notwithstanding this release, on January 19, 2011, Plaintiff contacted IDSC again to report that she would not be going to work because she was seeking psychiatric care. *See* PUF ¶ 116; RPUF ¶ 116. Based on information received from Plaintiff's mental health care providers, IDSC approved disability claims through January 26, February 13, February 20, March 6, and April 3, 2011. *See* PUF ¶ 118; RPUF ¶ 118.

Plaintiff does not aver or submit evidence that Defendant was ever notified, either by Plaintiff or her physicians, that she needed or intended to be absent from work for almost four months. Rather, Plaintiff's absences were erratic and for different reasons—either psychiatric or physical—and each time IDSC received a date from the health care providers about Plaintiff's ability to return to work, the dates were changed. *See* Mot. 11–12 (recounting the "on–again–off–again" pattern of requests for leave during this period). With this pattern of false starts and extended nonattendance, Plaintiff was absent from work between December 14, 2010, and April 3, 2011. *See* PUF ¶ 120; RPUF ¶ 120.

This type of request for extended, erratic, and indeterminate leave is not the kind of accommodation that is reasonable under the ADA. *See Taylor–Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 489 (7th Cir. 2014) (finding that "an employer is generally permitted to treat regular attendance as an essential job requirement and need not accommodate erratic or unreliable attendance." (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013))); *Henry v. United Bank*, 686 F.3d 50, 61 (1st Cir. 2012) (citation omitted) (finding an "open–ended request for additional leave" like the one at issue here to be "just the type of wait–and–see approach that has been rejected as giving rise to a triable issue on reasonable accommodation"); *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1239 (9th Cir. 2012) (finding that where an employee does not quantify the number of additional unplanned absences she is seeking, the only imaginable accommodation that would satisfy the employee "would be an open–ended schedule that would allow her to come and go as she pleased" (quoting *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 951 (7th Cir. 2001))).[6]

_____

[6] Plaintiff also appears to argue that she requested the accommodation of having her new workstation relocated because it was under an air conditioning vent, which she claims aggravated her lower back condition. *See* Resp. 24–25. The undisputed facts show, however, that Plaintiff was absent for at least three continuous months (without being exposed to Defendant's air conditioning vents) after

### D. Any Retaliation Claim in Plaintiff's Original Petition Is Unavailing

Plaintiff's Original Petition contains a single cause of action for disability discrimination, predicated on a failure–to–accommodate theory. *See* Original Pet. 7. However, apparently out of an abundance of caution, Defendant argues that any retaliation claim in Plaintiff's Original Petition fails as a matter of law. *See* Mot. 18. Here, too, Plaintiff fails to show a genuine issue for trial.

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the Act] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [pursuant to the Act]." 42 U.S.C. § 12203(a). "To show an unlawful retaliation, a plaintiff must establish a *prima facie* case of (1) engagement in an activity protected by the ADA, (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action." *Seaman*, 179 F.3d at 301 (citing *Grizzle v. The Travelers Health Network*, 14 F.3d 261 (5th Cir. 1994)). "If the employee establishes a *prima facie* case, the burden shifts to the employer to state a legitimate, non–retaliatory reason for its decision. After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation." *Feist v. La., Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (italics added) (quoting *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 388–89 (5th Cir. 2007)). Once the burden shifts back to the employee, she must show "that the adverse action would not have occurred 'but for' the

---

she complained about the location of her new workstation in December 2010. *See* PUF ¶ 120; RPUF ¶ 120. During this period, Plaintiff was treated by mental health professionals, who released Plaintiff to return to work on several occasions only to change the dates when Plaintiff could resume work. *See* PUF ¶¶ 116–18; RPUF ¶¶ 116–18. Defendant has thus presented evidence that Plaintiff's absences were unrelated to the location of her desk, and Plaintiff has failed to meet her burden of showing with competent summary judgment evidence a genuine dispute of material fact regarding this issue. *See LHC Group, Inc.*, 773 F.3d at 694 (quoting *Celotex Corp.*, 477 U.S. at 324).

employer's retaliatory motive." *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ——U.S. ——, 133 S. Ct. 2517, 2533 (2013)).

There are two possible protected activities alleged in the Original Petition. The first alleged protected activity is filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 21, 2010, and the second is requesting an unspecified reasonable accommodation on an unspecified date. *See* Original Pet. 7. Defendant argues that other than some temporal proximity Plaintiff cannot show a causal link between the filing of the Charge of Discrimination and Plaintiff's dismissal more than six months later. *See* Mot. 19. As Defendant points out, however, temporal proximity alone is not evidence of a causal connection. *See Strong v. Univ. Healthcare Sys., LLC*, 482 F.3d 802, 808 (5th Cir. 2007) ("[W]e affirmatively reject the notion that temporal proximity standing alone can be sufficient proof of but for causation"); *see also Mumfrey v. CVS Pharmacy, Inc.*, 719 F.3d 392, 405–06 (5th Cir. 2013). Plaintiff does not argue otherwise.

Instead, Plaintiff claims the protected activity at issue is the request that Defendant grant her an unspecified additional amount of leave with an indeterminate end date. *See* Resp. 27–28. To the extent it is pled in the Original Petition, this claim fails for two reasons: (1) Plaintiff's alleged request was not for a reasonable accommodation, and (2) even if it were, she has failed to show a retaliatory motive for her termination.

First, Plaintiff claims—citing inadmissible evidence—that she requested a modification of Defendant's attendance policy as early as July 12, 2010. *See id.* at 27. Then, on October 15, 2010, Defendant placed Plaintiff on Written Reminder—the second step in Defendant's Disciplinary Policy. *See id.* at 28. Plaintiff argues this is sufficient evidence of a causal link between a protected activity (the request that Defendant modify its attendance policy) and an

adverse action (placing Plaintiff on Written Reminder). *See id.* Assuming, *arguendo*, that Plaintiff proffers competent evidence of her request for a modification of Defendant's attendance policy and that the request was sufficiently specific, a request for extended, erratic, and indeterminate leave is not a request for a reasonable accommodation. *See Taylor–Novotny*, 772 F.3d at 489 (citation omitted); *Henry*, 686 F.3d at 61 (citation omitted); *Samper*, 675 F.3d at 1239–40. Plaintiff has thus failed to create a genuine issue of material fact regarding whether she engaged in this protected activity.

Second, because temporal proximity alone is insufficient to prove retaliation, Plaintiff also argues that Defendant's decision to place her on Written Reminder—the second disciplinary level—rather than Performance Notice—the first disciplinary level—was "[p]articularly insidious." *See* Resp. 28. This action is similarly insufficient to sustain a retaliation claim. Plaintiff ignores that Defendant's Disciplinary Policy allows for the disciplinary process to begin at step two when the performance issues are sufficiently serious to warrant it. *See* Disciplinary Policy 5–6; Mot., Ex. 2 ¶ 5. Defendant has presented evidence that it placed Plaintiff on Written Reminder and not Performance Notice because of Plaintiff's unsatisfactory attendance record, especially her unsatisfactory attendance between June and October 15. *See, e.g.*, Mot., Ex. 2 ¶ 5.

"[O]nce the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, [a] plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive." *McCoy v. City of Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007) (*per curiam*) (citation omitted). Plaintiff offers no such evidence here, admissible or otherwise. *See* Resp. 27–29. Given Plaintiff's failure to create a genuine issue of material fact for trial on either the potential retaliation claim or her failure–to–accommodate claim, Defendant is entitled to judgment as a matter law.

## IV.  CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Defendant AT&T's "Motion for Summary Judgment" (ECF No. 26) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of the Court **TERMINATE** Defendant AT&T from the above–captioned case.

**IT IS ALSO ORDERED** that any and all pending motions are **DENIED as MOOT**.

**IT IS ALSO ORDERED** that any and all outstanding deadlines and settings are **VACATED**.

**IT IS LASTLY ORDERED** that the Clerk of the Court shall **CLOSE** this case.

So **ORDERED and SIGNED** this _____ day of July, 2015.

DAVID C. GUADERRAMA
UNITED STATES DISTRICT JUDGE